*FILED*

JAN - 1 2007

UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA

By _____
    Deputy

UNITED STATES OF AMERICA,    .    Case No. 3:04-cr-00003-JWS

           Plaintiff,    .    Anchorage, Alaska
                   .    May 26, 2005
vs.    .    8:30 o'clock a.m.
                   .

LESLIE JAMES WILLIAMS JR.    .    **IMPOSITION OF SENTENCE**

          Defendant.    .

. . . . . . . . . . .

PARTIAL TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE JOHN W. SEDWICK
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:    FRANK RUSSO, ESQ.
                      U. S. Attorney's Office
                      222 West Seventh Avenue, #9
                      Anchorage, Alaska   99513
                      (907) 271-5071

Probation Officer:    BARBARA BURTON-NICHOLS
                      U. S. Probation/Pretrial Service
                      222 West Seventh Avenue, Room 168
                      Anchorage, Alaska   99513
                      (907) 271-5494

For the Defendant:    D. SCOTT DATTAN, ESQ.
                      2600 Denali Street, Suite 460
                      Anchorage, Alaska   99503
                      (907) 276-8008

Court Recorder:       ELISA SINGLETON
                      U.S. District Court
                      222 West Seventh Avenue, #4
                      Anchorage, Alaska   99513
                      (907) 677-6105

*T. M. Transcribing*
*1980 Commodore Drive*
*Anchorage, Alaska 99507*
(907) 277-8591 I Fax (907) 272-9258

**EXHIBIT G**

APPEARANCES (Continued):

Transcription Service:     T. M. TRANSCRIBING
                              1980 Commodore Drive
                              Anchorage, Alaska  99507
                              (907) 277-8591

Proceedings recorded by digital sound recording, transcript produced by transcription service.

T. M. Transcribing
1980 Commodore Drive
Anchorage, Alaska 99507
(907) 277-8591 I Fax (907) 272-9258

3

ANCHORAGE, ALASKA - THURSDAY, MAY 26, 2005

(Call to Order of the Court at 8:30 o'clock a.m.)

(Defendant present)

(Log 8:30:20)

THE CLERK:  Please be --

THE COURT:  Good morning.

MR. RUSSO:  Good morning.

THE COURT:  Please be seated.

MR. DATTAN:  Good morning, Your Honor.  May I -- may I remain standing, Your Honor?

THE COURT:  Yes, you may.  Please be sure to speak loud enough you're recorded.  It might be best for you to stand near the podium mic when you're speaking.

MR. DATTAN:  Thank you, I'll do so.

THE COURT:  All right, we're here this morning for proceedings in case A04-003, United States versus Leslie Williams.  We're here because Mr. Williams pled guilty pursuant to a plea agreement to one count of conspiracy to distribute cocaine to persons under 21 years of age, which is a violation of 21 United States Code Section 846 and 859(a).  A presentence report has been prepared from which information was not withheld.  Mr. Williams, have you read the presentence report?

THE DEFENDANT:  Which one, Your Honor?

THE COURT:  The most recent one.

THE DEFENDANT:  Yes, I have.

1    THE COURT:    And have you discussed it with your

2    lawyer?

3    THE DEFENDANT:    Yes, we have.

4    THE COURT:    I've read the presentence report and the

5    parties' sentencing materials, and based upon the information

6    available I do accept the plea agreement whose approval I

7    reserved at the time Mr. Williams entered his plea of guilty.

8    As a preliminary matter I want to mention that developments in

9    the law have essentially come full circle in this case since the

10   time when Mr. Williams entered his plea with respect to relevant

11   conduct and in particular the quantity of drugs for which Mr.

12   Williams may be held responsible.

13   When he pled guilty Mr. Williams admitted the commission of

14   the crime but he did not admit that he was responsible for a

15   quantity in excess of five kilograms of cocaine, the amount

16   attributed to the conspiracy by the United States.    At that time

17   I explained to Mr. Williams that the government would be --

18   would attempt to prove up that amount in connection with the

19   sentencing, but that he remained free to argue the amount

20   involved was less.    Then following the surprising decision in

21   Blakely vs. Washington in which the Supreme Court struck down a

22   State of Washington sentencing scheme, the Ninth Circuit

23   announced in its decision United States vs. Ameline that the

24   only drug quantity for which a defendant such as Mr. Williams

25   could be held responsible is the amount he actually admitted.

1    However, after the United States Supreme Court rendered its

2    next major decision in the area, <u>Booker vs. The United States</u>,

3    which, among other things, allows proof of sentencing

4    enhancements such as drug quantity to be presented to the trial

5    judge at the time of sentencing, the Ninth Circuit withdrew the

6    opinion in <u>Ameline</u>.

7    In effect, then, we are back to the situation we were in

8    when Mr. Williams pled guilty with one important exception; in

9    accordance with <u>United States vs. Booker</u> when determining the

10   sentence to be imposed today I will consider the factors

11   specified in 18 United States Code Section 3553(a), including

12   the guidelines in -- that are published by the United States

13   Sentencing Commission, but I am no longer compelled to impose a

14   sentence within the range determined by the application of the

15   guidelines.

16   With all of that by way of preface, it's not clear to me

17   which portions of the -- by the way, let me say the presentence

18   report -- there's nothing wrong with preparing more than one

19   presentence report.  The defendant was given an opportunity to

20   look at the most recent one, and it -- it updated the

21   information that was available.  The court should be considering

22   any information the parties perceive right up to the point of

23   sentencing.  For example, if Mr. Williams or the government

24   wanted to call a witness today, it would be my responsibility to

25   consider what that witness had to say.

1    In any event, Mr. Dattan, it's not clear to me which

2    paragraphs in the presentence report the defendant objects to,

3    so if -- if there are any you need to advise me by paragraph

4    number what they might be.  Let's start with the presentence

5    document itself, and then we'll take up Attachment A which forms

6    part of it.

7            MR. DATTAN:  Your Honor, the objections I made to the

8    presentence report were essentially the conclusions that had

9    been changed, not the facts that had been changed.

10           THE COURT:  The legal conclusions that are recommended

11    regarding --

12           MR. DATTAN:  That's correct.

13           THE COURT:  -- the facts recited?

14           MR. DATTAN:  That's correct, Your Honor, the fact --

15    the factual objections that we made were -- were addressed the

16    first time that I objected to the presentence report.  For

17    instance, there were a number of errors regarding his prior

18    criminal history because he and his brother had been confused in

19    a number --

20           THE COURT:  Correct.

21           MR. DATTAN:  -- of instances.

22           THE COURT:  But those have been corrected.

23           MR. DATTAN:  Those have been corrected.

24           THE COURT:  All right.

25           MR. DATTAN:  It was the legal conclusions increasing

the guideline range to which I objected to Ms. Nichols and which
is an overall objection to the second presentence report.  There
is, however, a strenuous objection to this second recommendation
that I received regarding special conditions.

THE COURT:  Okay, we'll take those up -- we'll take
those up at the appropriate point, and we'll -- I'll hear
argument on those.  But let me then just state for the record
that with regard to the factual statements in the presentence
report I find they are supported by a preponderance of
reasonably reliable evidence and so adopt them to make my
findings for purposes of this sentencing proceeding.

That means that we will need to have argument on the
various legal conclusions that will apply to Mr. Williams's
sentence, and they will include the special recommendations.
But let's put the special recommendations off 'til the very
last.  I'd rather focus first on the principal arguments.  So,
Mr. Dattan, I'll hear from you, and then I'll hear from Mr.
Russo regarding what you think an appropriate sentence might be.
And then I'll hear from -- well, I'd like to hear that first,
and then we'll hear argument on the special conditions because
it's sort of a separate matter.  Then I'll hear from any victims
who are here and then I'll hear from Mr. Williams.  So Mr.
Dattan, if you'd like to proceed.

MR. DATTAN:  Thank you, Your Honor.  I --

THE COURT:  Let me say, then, I should just -- just

1   because it gives us a -- it gives us sort of a starting point.

2   As you all know, the guidelines are not -- are not mandatory and

3   I'm not required to follow them, but let me at least indicate

4   that based upon the facts then the offense level would be 31

5   with a criminal history category of III, which provides a

6   guideline range of 135 to 168 months.  All right, please

7   proceed.

8             MR. DATTAN:  At this point in this case Your Honor

9   probably knows more of the facts of this case than I do, having

10  enjoyed the sentencing hearing for Mr. Boehm over a number of

11  days.  From -- from Mr. Williams's perspective he -- at the

12  outset what he was doing was providing a commodity to a willing

13  customer, an adult who sought the product that he was selling.

14  And he knows that it was an illegal product, but that -- that's

15  what he thought he was doing at the outset of this case is

16  selling drugs to a man who had money to buy drugs and wanted

17  them, and if he didn't do it somebody else was going to do it.

18  Mr. Williams wasn't -- or, at least from his perspective he was

19  never a major drug dealer in this town, but he was a supplier to

20  a man who had a severe drug habit and had tremendous demand

21  for -- for cocaine.

22            Over the course of the years of -- of whatever was going on

23  at Mr. Boehm's house he became more and more involved in it,

24  again without a -- without a realization, without a -- without a

25  complete thought process that explained to him how -- that

1    enlightened him as to how he was -- how his actions in selling

2    cocaine and getting involved with these people who were around

3    Mr. Boehm was affecting lives other than himself and Mr. Boehm.

4    One would think that a man in his 30s would -- would have more

5    insight than that, but apparently Mr. Williams didn't.  He does

6    now.

7        It's very interesting to have known this man for I think

8    almost two years, a year and a half, anyway, and -- and, as this

9    court knows, at one point he and I were at cross purposes, the

10    court had to appoint another lawyer to look into the possibility

11    of him withdrawing his plea and we've talked about this case for

12    hours and hours and hours, and mutually arrived at an

13    understanding of -- of his role in the crimes with which he's

14    charged.

15        He never -- he never set out to provide sexual victims for

16    Mr. Boehm.  That was never his intent.  Nor was he -- nor was

17    his intent ever to be a sexual predator in any way.  And -- and

18    even the sentencing memorandum -- I mean, I'm sorry, the PSR

19    will show in the -- in the -- in his criminal history that he is

20    not ever convicted of prior sex crimes.  That's just not

21    involved here.  He was involved in a -- in a dispute over his

22    children and he's -- I have to go into this because -- because

23    of the recommendations.

24        He was investigated -- the mother of his children in an

25    effort to take custody of the children, which is very common in

1  domestic cases, alleged that he had sexually abused them

2  somehow.   This was thoroughly investigated.   He was charged but

3  he wasn't convicted of any sexual abuse.   The conviction to --

4  the charge to which he I think pled was assault in the third

5  degree.   And Mr. Boehm -- I'm sorry.   Mr. Williams was not -- he

6  categorically denies ever assault -- sexually abusing his

7  children and he was not convicted of that crime.

8      He -- his parental rights were terminated as part of his

9  agreement therein, and he essentially had to give up on his

10 children.   He thought it was the best thing to do at the time

11 and -- and he can explain that in more detail.   But it -- it all

12 wraps up in him having been raised by his grandfather and

13 allowing his -- the children's grandfather to be involved in

14 their lives and then disputes and wanting to be back involved in

15 the children's lives.

16     And I bring all this up because a major aspect of this case

17 is obviously the effect it had on the young women, young girls,

18 who were clearly harmed in this case by the conduct of the

19 people charged with these crimes.   I'm fairly certain at this

20 point that it was never his intent to harm these children.   He

21 just didn't appropriately consider that the -- the conduct in

22 which he was engaged and just kind of went along with what he

23 saw was already going on at Boehm's house.

24     As you know, Mr. Boehm was sentenced to slightly more than

25 11 years and, although I was unable to attend that lengthy

1  sentencing hearing, I -- my impression of it was that Mr. Boehm
2  was in charge of his faculties and in charge of his life and
3  knew more or less what he was doing, or at least I believe that
4  was the court's conclusion, and -- and he was unable to -- to
5  convince the court that everything he did was as a result of a
6  giant manipulation by the co-defendants in this case, by Mr.
7  Williams and by Ms. Tyree and by Mr. Bolling.
8      Certainly Mr. Williams never thought he was manipulating
9  Mr. Boehm into anything except he encouraged this friendship, if
10 you will, an odd friendship of a man in his 30s and a man in his
11 60s with disparate backgrounds because Mr. Williams had this
12 idea that eventually he'd be trusted enough by Mr. Boehm that
13 Mr. Boehm would lend him a large sum of money to start his own
14 business.  Which is what Mr. Williams sought from this whole
15 thing, actually, was a -- an investor, a stake.  He's not a --
16 he doesn't have an employment history or a financial background
17 that would allow him the normal channels of financing, so in his
18 convoluted way he saw this as a possibility of obtaining
19 financing for dreams that would change his life.  Well,
20 obviously it changed his life but not the way he expected.
21     You sentenced Mr. Boehm to slightly over 11 years, I think,
22 and you sentenced Ms. Tyree to three, I think.  Given his
23 conduct, his overall role in this organization or conspiracy or
24 group or whatever it's called, an appropriate sentence would
25 probably be somewhere between those two.  He's not the

1    ringleader, he's not the boss of this operation.  It was either

2    Mr. Boehm or perhaps Mr. Bolling, perhaps Ms. Tyree.  This man

3    came along somewhat afterwards and joined in, but certainly

4    didn't create the situation that existed.  He just facilitated

5    it by providing drugs and then going along with what was going

6    on, which was unpleasant and illegal.

7         He's been in prison for quite a while now both here and in

8    SeaTac.  He spoke to the police almost immediately, never denied

9    that he was providing drugs.  For some time he sort of minimized

10   his other conduct in this case.  I don't think he'll do so any

11   more.  I think he does understand the effect that -- that his

12   actions had on these women and on the community.

13        Given the fact that he spoke early and often both to

14   representatives of his co-defendant, Mr. Boehm, and to the

15   government, he tells me that he's been involved in three

16   separate indirect threats against his life while he was at

17   SeaTac.  He's already known as a snitch, despite the fact that

18   nobody's seeking a Section 5K1.1 departure here for cooperation.

19   Even the newspaper articles have indicated that Mr. Williams

20   agreed to cooperate.  This is not a healthy situation for him in

21   the Bureau of Prisons, and it gives him great concern.  To that

22   end he's specifically stated he absolutely does not want to be

23   in Sheridan.  That -- I can argue that one later, but -- but

24   essentially he wants a recommendation that he not be placed in

25   Sheridan because there are so many Alaskans at the federal

1    correctional institute there.  He figures that would be the most

2    unhealthy --

3                 THE COURT:  All right, well, I'll --

4                 MR. DATTAN:  -- prison.

5                 THE COURT:  -- certainly make that recommendation.

6                 MR. DATTAN:  So -- so ultimately what I'm arguing,

7    Your Honor, is what -- what I said in the sentencing memorandum

8    that I filed.  That he accepted responsibility early and often.

9    He was unwilling to say that Mr. Boehm was the evil kingpin that

10   the government believed him to be and therefore his testimony

11   was kind of worthless.  He had a sort of a nuanced idea of Mr.

12   Boehm's role in this whole thing.  And then he talked too often,

13   and not just to the government but to Mr. Boehm's

14   representatives, and -- and he's not able to cooperate as -- as

15   whatever testimony he might've had essentially became too

16   conflicted and too difficult.

17        He has asked me to bring up the fact that in the plea

18   agreement on Page 20, the Paragraph C, the parties also agree

19   that during the period of the conspiracy the cocaine he supplied

20   was distributed to several persons under age of 21, thus,

21   pursuant to the sentencing guidelines Section 2D1.1(c)(4) and

22   2D1.2(a)(1), the two-level increase applies and is adjusted

23   offense level for Count 9 is 34.  He asked me to bring this up

24   because of the -- the statement in the -- on Page 6 of the

25   presentence report at Paragraph -- I'm sorry, wrong page.

1    (Counsel confers with defendant)

2    MR. DATTAN:  That's -- that's in contrast to this

3    court's order back in July, Your Honor, where -- where the court

4    referenced Section 2D1.2(a)(3).  And that's on Page 5 of your

5    order, which --

6    THE COURT:  Well, as I tried to explain, I remember

7    that order dealt with the situation created by <u>Ameline</u> and the

8    Ninth Circuit withdrew <u>Ameline</u>, so --

9    MR. DATTAN:  I understand that completely, Your Honor.

10   Nevertheless, Mr. Williams asked me to bring it up and it's --

11   THE COURT:  Well, it's appropriate to bring it up, I

12   brought it up myself here at the outset, because, of course,

13   when I -- when I wrote that order I was relying on what was then

14   the law of this circuit.

15   MR. DATTAN:  I understand.

16   THE COURT:  And it was the circuit court, not me, that

17   withdrew <u>Ameline</u>.

18   MR. DATTAN:  I understand and thank you, Your Honor.

19   Okay, so ultimately, Your Honor, what I -- what we're asking for

20   here is consideration of the statutory factors as well as the

21   sentencing guidelines, and one of those factors, obviously, is

22   the -- is the disparity of sentencing.  And in a -- imposing a

23   sentence on Mr. Williams in excess of that imposed on Mr. Boehm,

24   given their relative roles in this overall scheme, would seem

25   inappropriate.

In addition, Your Honor, I -- Mr. Boehm -- Mr. Williams is clearly going to exercise his right of allocution here because after all of the things he said, both to the government and to Mr. Boehm's investigator, I think he needs to tell this court what he understands now, what he -- what his reasoning now, what is -- you know, his epiphany, as I called it, and his plans for the -- you know, how -- how he intends to address the future. Because there's no doubt he's subject to a significant term of imprisonment.

He turns 41 next month. He's actually a very bright man. You -- you've noticed that in the way he handled himself in the change of plea hearing. I mean, he -- he's an articulate and bright man and there is hope for him. And the sentence fashioned obviously has to punish him, has to deter others, but it also should take into account that the statute says a sentence sufficient but no greater than necessary to -- to achieve the goals of punishment, and it should consider that this gentleman has an excellent chance for rehabilitation, that he will genuinely and in a most heartfelt way tell the court that under no circumstances will he be involved in drug dealing ever in the future. He's said that to me completely unsolicited and obviously he'll say that to the court, although at this point, you know, it's -- it's part of what he wants the court to hear. But I ask the court to consider it very carefully because, as is only somewhat common among criminal defendants,

1    he seems to get it.  He seems to understand what's going on and

2    that his conduct had consequences and that he's at a crossroads.

3    Better later than never.  Age 40 is when he figured out that he

4    has to change his life.  Thank you, Your Honor.

5              THE COURT:  Thank you, Mr. Dattan.  Mr. Russo?

6              MR. RUSSO:  Thank you, Judge.  Just one issue I had is

7    I didn't know if the court wanted me to address the relevant

8    conduct issues pertaining to the presentence report or not.  If

9    the court has found that the level 31 and criminal history

10   Category III is --

11             THE COURT:  Well, the guideline level is level -- is a

12   level 31, criminal history Category III.  The question, however,

13   nowadays is what's --

14             MR. RUSSO:  Sure.

15             THE COURT:  -- the appropriate sentence, given that

16   that's one but only one of the factors that I should consider.

17             MR. RUSSO:  Okay, Your Honor.  I guess just to speak

18   briefly to, you know, the sentencing memorandum we filed, that

19   certainly was filed at the tail-end of the Boehm sentencing

20   hearing and so I didn't have a chance to talk thoroughly with

21   Mr. Dattan before we filed that.  And I've talked since and had

22   certainly some opportunity to reflect upon what was in there and

23   what factors should be appropriately considered when sentencing

24   this defendant, and I just want to address some of the things

25   that at least I've thought about since we filed that.

1      When we recommended the 168 sentence we certainly did it

2    for a few reasons, and, you know, the most important reason is,

3    like all the other -- unlike all the other people in this house,

4    300 Oceanview as well as the other locations, Mr. Williams was

5    the only one who was not high at the time.  He was the only one

6    who was operating with all his faculties.  And that certainly is

7    an aggravating factor that we believe is appropriate for the

8    court to consider.  Basically his interest in this was not

9    really getting drugs for himself, it was -- it was money and it

10   was greed, and I think that's an important factor to consider.

11     The next was certainly the complete lack of remorse that

12   Mr. Williams had demonstrated throughout this case and

13   throughout the investigation.  I understand that there's

14   certainly been a change of heart lately in that.  I hope that's

15   true, but, to give you my perspective on what Mr. Williams's

16   position was during this investigation and his position during

17   debriefs was that, you know, he didn't make anybody do what they

18   didn't want to do, and he -- he held to that belief very

19   adamantly, you know, without regard to the fact that crack

20   cocaine has highly addictive properties, without regard to the

21   kids that were smoking this crack cocaine were certainly more

22   susceptible to being taken advantage of.

23     I can say, though, however, right before the Boehm trial

24   began that Mr. Williams did start to realize it, and I believe

25   we had a couple conversations before the Boehm trial was set to

1  begin where he seemed to start to get it.  I hope that has come

2  to fruition now because, really, we have to consider what

3  happens due to the effects of crack cocaine, due to the ages of

4  these minors and these victims.

5      You know, next the other factor was that he -- he tried to

6  withdraw his plea in the middle of all this and create a

7  tremendous distraction for everyone involved that eviscerated

8  his potential for cooperation, and that was -- it was a factor,

9  although we are still recommending that he do receive acceptance

10 of responsibility because it seems like his desire to withdraw

11 this plea was based upon the changes in the law that really he

12 couldn't understand and -- and certainly most lawyers couldn't

13 understand either.

14     And then finally he -- you know, he gave some statements to

15 the defense investigators and in some of those statements, you

16 know, there were things said that were untrue.  I'll just leave

17 it at that.  You know, and then I had a chance to talk to Mr.

18 Dattan fairly recently and, you know, reflected upon all this,

19 and, you know, I don't think it's appropriate for the government

20 to consider the statements he gave to Mr. Boehm's investigator.

21     These statements were surreptitiously recorded by Mr.

22 Boehm's investigator in violation of the rules of ethics

23 pertaining to attorneys, and certainly I can't see a way that it

24 wasn't in violation of a rule of ethics not to contact Mr.

25 Dattan when seeking to interview Mr. Williams.  It's something

that any third-year law student would know about.  And I know
that I'm not prohibited from using those statements because it
wasn't government-initiated, but something about using them does
not sit right with me and I'm not comfortable saying that his
sentence should be affected by that in any way.  So I just sort
of -- I know we've referenced it in the sentencing memorandum
but that is the part that I've sort of wished to redact in
there.

Your Honor, then when you look at some of the other things,
Mr. -- Mr. Williams did plead guilty early on and certainly he
should be given credit for that, and he saved some of the
victims from having to testify, so that -- that is a factor that
militates in his -- his favor.  And again, you know, hopefully
he is certainly going to address his remorse because there's
certainly issues with the way he -- His world view of what
happened here was just completely blighted.

And then I'm certainly, you know, impacted by the fact that
certainly Boehm got -- he had -- he had the same guideline range
as Mr. Williams, 135 to 168, and we agreed to the low end of the
guideline range for Mr. Boehm, and there were really three
reasons for that.  One is that Mr. Boehm was 61 years old and,
you know, an 11-year sentence would significantly impact the
rest of his life, if not all of his life, and he certainly
presented less of a danger to the community if he got out at age
70-something.  So that was -- that was a factor.

1    And certainly that -- you know, the serious substance abuse
2    issues.   That wasn't an excuse for Mr. Boehm's conduct, but it
3    may have provided am impetus for this whole thing to get started
4    and it starting snowballing to manic proportions, as Your Honor
5    knows.   And again, the other reason for the low end of the 135
6    months was that we avoided calling some of these victims that
7    were petrified to testify and certainly petrified to face cross
8    examination.

9       So the whole situation, the distinction between Mr.
10   Williams and Mr. Boehm, reminds me of a hypothetical question
11   that I got during my interview as an assistant district attorney
12   in Manhattan.   I was asked the question, well, you have two
13   people who do the same crime.   All other factors being equal,
14   one of the people is a member of the community, he's well
15   respected, who's done a number of things for the community, and
16   another of the kids is a street kid from Harlem who grew up in
17   the projects, you know, do you give credit to the person who has
18   done a lot for the community?   Should he get a lesser sentence?
19   And my answer then, as is my answer today, is that no, you treat
20   those people the same, given all other factors being equal.

21      The problem I've had, and the problem I've struggled with
22   is that here all other factors are not equal.   And the thing
23   that most concerns me is Mr. Williams is younger than Mr. Boehm
24   and I feel that he presents a grave danger to the community.
25   He's going to be out probably when he's in his 50s, early 50s,

1    which is the age that Mr. Boehm really started to spiral out of

2    control, so I believe Mr. Williams is capable of repeating his

3    offense.  And I hope what Mr. Dattan says is true, that he does

4    not repeat the offense, that he's reformed, that he does not go

5    back to drug dealing, but I guess I've been doing this not --

6    not very long but long enough to know and long enough to be

7    skeptical when I hear defendants at sentencing say that.  So

8    that is a concern.

9         The other concern is that his criminal history does involve

10   sex offenses against children.  I know it's just a -- it's an

11   assault conviction --

12                THE COURT:  Well --

13                MR. RUSSO:  -- but the underlying offense was that he

14   sexually abused his children.

15                THE COURT:  Well, I must say I -- I take with a grain

16   of salt what is said in a domestic relations dispute.  It may be

17   that the woman told the truth, but it's also well-known to the

18   court and the community that people in those circumstances will

19   make all sorts of allegations that really aren't founded.  I'm

20   really reluctant to rely on that.  I just -- I don't think it's

21   -- you know, if I had more evidence on it perhaps, but I just --

22   I think the only thing he's guilty of in his criminal history is

23   the assault he pled guilty to.

24                MR. RUSSO:  Sure.  And there were three assaults that

25   he pled guilty to --

1          THE COURT:  Yes.

2          MR. RUSSO:  -- one on each kid.

3          THE COURT:  I agree there's a history of violence

4   here, but I'm not prepared to say that there's a history of

5   sexual abuse of kids in his past.

6          MR. RUSSO:  Okay, understood, and -- but there is a

7   more recent criminal history that, you know, the court --

8          THE COURT:  Well, there's -- there's all the activity

9   that went --

10         MR. RUSSO:  Sure.

11         THE COURT:  -- on in Boehm's house.

12         MR. RUSSO:  And obviously that obviously was severe.

13  You know, and finally, again, he was the only one with a clear

14  head, so I mean, I think you can't compare apples and oranges

15  here, Mr. Boehm to Mr. Williams, and I -- and I submit to the

16  court that he does deserve a sentence higher than Mr. Boehm

17  based on the extreme need to protect the community here.  And,

18  you know, that is our -- our concern is that, you know, Mr.

19  Williams may get out and do something like this again.  He's

20  certainly capable of it at the age that he's going to be getting

21  out of -- out of jail, presumably.

22      While maybe not the top end of the range, 168, would be

23  appropriate, but I think certainly somewhere along the middle

24  end of the range, around 13 years, would be appropriate to

25  address the safety of the community as well as take into account

1  Mr. Williams's early plea of guilty and his activities during
2  the case that really kind of shot himself in the foot with
3  respect to any -- any benefit for cooperation.

4          THE COURT:  Let me just address this before I hear
5  from any victims and from Mr. Williams.  There are a number of
6  special conditions basically suggested by the probation officer
7  relating to the proposition that Mr. Williams is really, in
8  effect, a sex offender.  I gather that the government would
9  support those based upon what happened in the Boehm household.
10  I know that you were prepared to support them with regard to the
11  prior criminal history.  But I just -- I've already indicated I
12  don't think the prior criminal history should be considered for
13  that purpose.  But do you want to address that further, and --
14          MR. RUSSO:  Certainly.
15          THE COURT:  -- then I'll hear briefly --
16          MR. RUSSO:  Certainly.
17          THE COURT:  -- from Mr. Dattan about that.
18          MR. RUSSO:  There was indications that Mr. Williams
19  had sex with a number of the -- the minor girls in the house.  I
20  mean, I think it started out as a business relationship where he
21  started selling drugs, and then as things snowballed there
22  tended to be this younger teenager element in that that Mr.
23  Williams also availed himself of, and he had sex with some of
24  the young girls and -- and among the minors were -- and I
25  believe they're reflected in the grand jury minutes that the

1  court has, the grand jury testimony.  MD, who was 15 years old
2  when she started this.  There was also KW, who was 16 years old.
3  And I know there -- there were others but I just don't want to
4  misspeak, but --
5          THE COURT:  Right.  All right.
6          MR. RUSSO:  -- I know that they're all contained in
7  the grand jury --
8          THE COURT:  Anyway, it would be based upon the
9  proposition that there was sexual contact with minors --
10         MR. RUSSO:  Absolutely.
11         THE COURT:  -- during the course of this conspiracy.
12  All right, thank you.
13         MR. RUSSO:  Thank you.
14         THE COURT:  Mr. Dattan, would you like to speak
15  briefly regarding the special conditions, then, before I hear
16  from any others who wish to speak?
17         MR. DATTAN:  Thank you.
18         THE COURT:  I've indicated that I -- I agree with you
19  in terms of the way in which one should characterize the past
20  criminal history, but there is a serious concern here with
21  respect to what happened during the course of this conspiracy.
22  I mean, I realize it was Mr. Boehm's sexual appetite was being
23  constantly fed here, but there's clearly evidence that both Mr.
24  Williams and Mr. Bolling took advantage of these kids.
25         MR. DATTAN:  And, Your Honor, I have two daughters.  I

absolutely cannot put myself in the position of defending any
such conduct.  In -- by way of explanation -- I mean, is that
the word I'm looking for?  He really -- according to Mr.
Williams, he didn't know these were teenage girls.  I don't know
any of them, I -- I can't judge his perception.  A more
responsible person takes a different approach towards this whole
event.  I don't think he's -- these appear to be -- and I may be
wrong, Your Honor.  I've read the grand jury transcripts, but
I -- I've made no effort to contact these victims or discuss it
with them personally.  And -- and I don't know.  But if -- you
know, it's -- it was more an opportunity crime, apparently, than
a sexual assault by Mr. Williams.

He -- these recommendations are that he participate in a
program of sex offender assessment and treatment.  He objects to
that, but perhaps -- and I'm going sort of beyond what Mr.
Williams wants me to do here.  Perhaps the sex offender
assessment will demonstrate that he's not a sex offender and
then whether or not he has to be registered as a sex offender,
whether or not there's a sexual assault here, whether or not he
is a sex offender can be addressed by the sex offender
assessment.  I mean, obviously being a sex offender and being a
snitch is worse in prison than being a sex offender or being a
snitch.  And being both, you know, isn't -- isn't something that
he wants to deal with.  I mean, obviously he must if this court
finds him that way, and -- and I think before -- I mean, before

1    my argument can ever be complete the court has to hear from him.

2    But --

3              THE COURT:  Well, I will, I just wanted --

4              MR. DATTAN:  -- and he -- and he's tried --

5              THE COURT:  -- to know if you had any -- anything to

6    add --

7              MR. DATTAN:  I -- I --

8              THE COURT:  -- to what -- you addressed it to some

9    extent in your original remarks.

10             MR. DATTAN:  I'm not really capable of enlightenment

11   here because I'm --

12             THE COURT:  All right, well, I'm going to hear --

13             MR. DATTAN:  -- you know, torn between two poles here.

14   You know, I'm a defense lawyer and a father and it's a very

15   difficult argument for me to make.  Mr. Williams is in a -- is

16   -- he has no -- as the court indicated, you know, the previous

17   allegation is a tenuous one and I -- and I thank the court for

18   that assessment of it.  I think in the context Mr. Williams

19   never intended to be a predator here.  I mean, I think it was,

20   again, an oppor -- crime of opportunity as opposed to one in

21   which he -- you know, he actively thought, you know, I -- I need

22   to take this little teenage girl --

23             THE COURT:  I understand what you're saying.  Absent

24   the opportunity this -- this kind of -- I mean, he -- he's

25   demonstrated that he's a drug dealer, but the other -- most drug

1    dealers don't get the opportunities he got I think is what

2    you're saying.

3              MR. DATTAN:   Thank you.

4              THE COURT:   All right, Mr. Russo, are there any

5    victims who would like to speak?

6              MR. RUSSO:   I don't believe so, Your Honor, no.

7              THE COURT:   All right.   Mr. Williams, you have the

8    right to speak, so now is your opportunity.

9              THE DEFENDANT:   May I --

10             THE COURT:   You may stand there if you prefer.

11             THE DEFENDANT:   Your Honor, I'd like to take this time

12   to address the court and the community and the prosecution.

13   I've had the unique opportunity to sit awaiting the proceedings

14   for the last 16 months, and I've had the opportunity to look at

15   this from a different perspective than I looked at it when I was

16   a participant or even before I was a participant.   The situation

17   that I involved myself in is a reprehensible situation.   The

18   damage that was caused to the community, the victims, their

19   family, is more than I ever could imagine.   In prior conduct I

20   never, ever dreamt what happens to that person once they leave

21   my sight or once whatever transaction transpired between me and

22   that person and they go home, the feelings or the guilt and the

23   pain, the shame, the hurt they feel, they continue to feel to

24   this day, and -- I do feel responsible for my actions and I do

25   see how my actions had a rippling effect beyond the Boehm home,

beyond the people that I met there at the Boehm household, and I -- I apologize. I'm very remorseful for -- for what happened.

I thought at age 30 that you wouldn't be influenced by peer pressure or relative morality but unfortunately I was. I saw things happening, they became commonplace to me. In retrospective they weren't okay. Saw them every day, I became callous or jaded. I was motivated by monetary actions with my relationship with Mr. Boehm, which is not an excuse, Your Honor. I'm just -- that was my motivation for my -- my initial relationship with Mr. Boehm.

And I intend to hold myself to a higher standard morality from this point on. I've made this decision prior to today. I intend to never cause that type of pain to any member of the community ever again. And I know Mr. Russo feels that I'm a danger to the community. I just would like to say that there's a six-year supervision, besides my sentence. That I have no desire to come back before this court to try to explain my actions if they are -- that could be -- in any way that would bring me back before the court, because there would be no excuse.

I have a desire to start a career, I'm willing to put in the effort to work at developing the contacts that I've tried to shortcut through my involvement with Mr. Boehm. A job, if someone's willing to hire me, I have a career path in electronics I'd like to seek. And I realize the mistakes that

1    I've made and I -- I feel horrible.  I really do.  I can't

2    imagine how I allowed myself to spiral out of control and become

3    involved in such an environment.  Those are my intention.

4        And like I said, Your Honor, I intend to hold myself to

5    higher standards.  I didn't one day go from being this person to

6    being the person that I was when I was arrested.  It was a

7    gradual slide.  And I realize now that you have to every day

8    hold yourself accountable to your actions and how your actions

9    affect other people.  People look at what you do, just like I

10   was looking at what was going on and I began to say oh, that's

11   okay.  Well, I don't want anyone to ever look at something that

12   I'm doing and think that what I'm doing, if it's not right, to

13   be okay.  I want them to look at the things that I do and know

14   that I'm holding myself to a higher standard than -- than the

15   court or the prosecution would ever hold me to from this point

16   on.

17        THE COURT:  Okay, thank you, Mr. Williams.

18        THE DEFENDANT:  Thank you, Your Honor, for this time

19   and opportunity to address the court.  And Mr. Russo, I'd like

20   to apologize for anything that was said in my statement to the

21   prosecution that offended you in any way.  It wasn't my

22   intention, I was upset with the goings on, I didn't understand

23   the total ramifications of the law, I felt -- I don't know, I

24   didn't know who to turn to.  And it -- I didn't think we were

25   having an interview, I thought we were having a conversation

1    with someone I had met prior to that day.  It was -- I -- I had

2    met the person, I helped work on their deck, so I thought we

3    were having a personal relationship, a personal conversation and

4    not a professional conversation, Your Honor.  Thank you.

5            THE COURT:  I'm not going to consider those

6    conversations, Mr. Williams.  I -- I agree with Mr. Russo.  It

7    would be fair game for the government to rely on them, but it --

8    given the way in which they were recorded, it's very troubling.

9            Well, first let me indicate that with regard to the special

10   conditions that a -- I'm going to impose much more limited

11   special conditions than were suggested by the author of the --

12   suggested recommendations.  I do that because I believe that Mr.

13   Williams, although clearly guilty of participating in sexual

14   conduct that's inappropriate, isn't really someone who seeks

15   that sort of inappropriate stimulation and gratification but

16   rather is somebody who -- who found himself in utterly

17   remarkable circumstances, God hopes, never to be duplicated

18   again in our community.  And almost surely never to be

19   duplicated again in the circumstances in which Mr. Williams

20   finds himself.  So I will impose some but considerably fewer

21   special conditions than were suggested by the author of the

22   presentence report.

23           With respect to -- with respect to an appropriate sentence

24   in this case, the court is required to consider all of the

25   factors elaborated by Congress is 18 United States Codes Section

1    3553(a).  The nature and circumstances of the offense and the
2    history and characteristics of the defendant all would support a
3    very high sentence because of the nature of the crime which was
4    committed and the fact that in essence Mr. Williams is -- is a
5    drug dealer.  And the court must consider the need that the
6    sentence has to reflect the seriousness of the offense, promote
7    respect for the law and to provide just punishment.  Again, a
8    substantial sentence is indicated.  Adequate deterrence for
9    criminal conduct would also indicate a relatively high sentence.
10   But none of this is particularly surgical in indicating just
11   exactly what is a relatively high sentence.

12       In terms of protecting the -- that is to say, I mean, a
13   sentence of 10 years, 12 years, 14 years, nine years, all of
14   those things ought to be adequate to deter other people from
15   engaging in these kinds of criminal conduct.

16       Protecting the public from further crimes of the defendant.
17   I hear Mr. Russo speaking as a cautious spokesman for the
18   community, but I also hear Mr. Williams speaking as someone who
19   I think has finally examined his own heart and finally realized
20   that there are other people on this planet besides himself.  I
21   don't know what his circumstances are intimately.  It may be
22   that he's had a pretty tortured life of his own in the past.
23   And people who have that kind of experience sometimes become
24   very focused on themselves and their own interests and become
25   unable or unwilling to understand that other people's lives are

1   affected by everything we do.  I think Mr. Williams now does
2   understand that and I don't think that he does pose the
3   substantial risk of future criminal behavior that Mr. Russo has
4   suggested.  So the need to protect the public from further
5   crimes of the defendant does not require a particularly severe
6   sentence in this case.

7       I must consider the need to provide the defendant with
8   needed educational and vocational training while he can received
9   those things while he's incarcerated and while he's on
10  supervised release.

11      The guideline sentencing range, as I've already indicated,
12  is a level 31, criminal history category of III, 135 to 168
13  months.  The -- in this case it's important, I think, as it is
14  in every one, but in this case it's particularly clear that the
15  need to avoid unwarranted sentencing disparities should be
16  considered.  Now, Mr. Boehm and Mr. -- Mr. Williams have -- do
17  in fact have somewhat similar records in some respects, which is
18  to say that Mr. Boehm in the far distant past did engage in
19  conduct which was actually more violent and reprehensible than
20  the conduct that I think Mr. Williams engaged in.

21      I have to consider the need for restitution to the victims.
22  Mr. Williams is not in a position to provide restitution because
23  he doesn't have the financial resources to do that.  Fortunately
24  in this case Mr. Boehm did.

25      And then lastly the court is required by the statute to

1   impose a sentence which is sufficient to meet all of the

2   objectives I've just mentioned but no greater than necessary to

3   do that.  I think in a sentence -- in sentencing Mr. Williams,

4   trying to balance all of those sometimes competing factors that

5   have been given to me by Congress to consider, that a sentence

6   of 124 months is appropriate.  That's less than Mr. Boehm got

7   and not an insignificant reduction.  I think that it also

8   adequately takes into account Mr. Williams's progress over the

9   last 16 months.

10       This is an unusual sentencing in the sense that I rarely

11  have somebody who's been held for as long as Mr. Williams has

12  been held.  And so we have a chance, if you will, to look at

13  what has happened to him as the result of incarceration.  And

14  although his incarceration is unpleasant for him personally,

15  what's happening to him individually is good in the sense that

16  he is coming to realize just how interrelated all we human

17  beings are and how the pursuit of his own selfish interests has

18  made life utterly miserable -- or, he assisted in making life

19  utterly miserable for any number of other young people.

20  (Log 9:23:25)

21       (This portion previously transcribed)

22       (Proceedings recessed at 9:29:08 o'clock a.m.)

23

24

25

*T. M. Transcribing*
*1980 Commodore Drive*
*Anchorage, Alaska 99507*
*(907) 277-8591 I Fax (907) 272-9258*

C E R T I F I C A T I O N

I, Teresa E. Mielke, court approved transcriber, certify

that the foregoing is a correct transcript from the official

digital sound recording of the proceedings in the above-entitled

matter.

_____

Teresa E. Mielke                                    January 10, 2007

T. M. Transcribing
1980 Commodore Drive
Anchorage, Alaska 99507
(907) 277-8591 / Fax (907) 272-9258