UNITED STATES DISTRICT COURT

DISTRICT OF ALASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | 3:04-cr-003 JWS |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | ORDER FROM CHAMBERS |
| | ) | |
| LESLIE J. WILLIAMS, Jr., | ) | [RE:   Motion at doc. 848] |
| | ) | |
| Defendant. | ) | |
| | ) | |

### I.  MOTION PRESENTED

At docket 848, Leslie J. Willliams, Jr. filed a motion pursuant to 28 U.S.C. § 2255 asking the court to set aside his guilty plea to one count of conspiracy to distribute cocaine to persons under 21 years of age in violation of 21 U.S.C. §§ 846 and 859(a). Following appointment of counsel, the petition was amended to include the supplementary argument provided by Williams' new counsel in her memorandum at docket 859.  The government filed a response at docket 879.  The court conducted an evidentiary hearing on April 30, 2007, at which defendant Williams and his prior counsel, Mr. Dattan, testified.

### II.  CLAIMS ASSERTED

Williams advanced eight grounds for relief in his original petition which may be characterized as follows:

(1) Ineffective assistance of counsel whose bias against Williams at all
stages was made manifest when "my counsel at sentencing on 5/26/05

told the court that he had nothing to say in response to Governments statements, because he was the father of two teenage daughters.

(2) Erroneous allocation of the burden of proof based on the fact that Williams disputed the amount of cocaine involved in the conspiracy.

(3) The United States breached its proffer agreement dated 2-05-04, when it filed a superseding indictment.

(4) The conviction was coerced in that he disputed that there were 5 kilograms of cocaine involved.

(5) The plea agreement was involuntary, because defendant repeatedly told defense counsel that he lacked knowledge of 5 kilograms.

(6) Plain error in failure to apply the decisions in *Apprendi*, *Ameline*, and *Blakely*.

(7) It was unlawful for the Probation Officer to prepare a second final draft pre-sentence report.

(8) Special condition of supervision #4 is wrongly included, because defendant has never been convicted of a sex crime.

At docket 859, Williams' counsel summarized his claims as follows:[1]

1. Trial counsel failed to argue his case at sentencing, exhibiting a bias against Defendant when he stated that he had nothing to say in response to the government because he was the father of two teenage daughters.

2. Defendant has consistently disputed the drug amount and did so at his change of plea hearing on May 17, 2004.  The Court accepted the plea to a detectable amount of cocaine.  The Defendant also disputed the Presentence Report statement as to base level offense of 32, which was set out in the second Presentence Report.  The government added Mr. Williams to the First Superseding Indictment after it has already agreed that he would enter a guilty plea to a count of the original Indictment which agreement was also set out in the government's proffer agreement.  Trial counsel failed to move for specific performance of the original agreement.  This plea agreement resulted in a base offense level 12 under the United States Sentencing Guidelines and was set out as such in the original Presentence Report.

---

[1]Doc. 859 at p. 2.

### III.  BACKGROUND

On January 22, 2004, an indictment charging Williams, Josef Boehm, Allen Bolling, and Bambi Tyree with conspiracy to distribute controlled substances to persons under 21 years of age in violation of 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(C), and 859(a) was filed.  The indictment contained eight additional counts including a charge that Williams was a felon who had possessed a firearm in violation of 18 U.S.C. § 922(g)(1).  The other counts were all directed at other defendants, primarily Boehm.  Scott Dattan was appointed to represent Williams.

At  the April 30, 2007, evidentiary hearing Williams testified that early on he became interested in striking a bargain with the United States.  Dattan testified that he remembered Williams being interested in contesting the charges, but when told that Williams had testified that he was interested in a "deal" early on, Dattan agreed that such was the case.  Williams' recollection is supported by a proffer letter dated February 4, 2004, sent to Dattan by Assistant United States Attorney Frank Russo.[2]

The proffer letter, which follows a format typically used in this district, set out the basic "deal" which Williams could get in the following language.

> (9) The promises made by the government in this agreement are expressly conditioned upon, and would not be made but for, your client's fully complying with its terms and agreeing to  . . . enter a plea of guilty to conspiracy to distribute controlled substances to underage persons, in violation of 21 U.S.C. §846. [3]

On March 18, 2004, the United States filed a superseding indictment which included all of the original charges and added nine more.[4]  Williams was named in eight of the new charges including a conspiracy to commit the crime of sex trafficking in children in violation of 18 U.S.C. § 371, and seven counts of sex trafficking in children in violation

---

[2]Doc. 879, exh. A.

[3]*Id.* at p. 3.

[4]Doc. 161.

of 18 U.S.C. § 1591(a)(1), (b) and 18 U.S.C. § 2.  Thereafter, on March 31, 2004, Russo sent Dattan a proposed plea agreement.  In the cover letter, Russo advised that, "the agreement contemplates your client pleading to the charges contained in the original indictment.  The plea agreement contains a factual stipulation that your client distributed over five kilograms of cocaine during the period of the conspiracy."

Eventually, a plea agreement was signed by Williams, Dattan, Russo and the United States Attorney.  The document was filed on May 12, 2004, under seal.[5]  It calls for Williams to plead guilty to one count of conspiracy to distribute controlled substances to minors in violation of 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(C) and 859(a), in exchange for which all of the other charges are to be dismissed.  The plea agreement expressly recites that Williams "supplied Boehm with at least five kilograms of cocaine during the conspiracy."[6]

The plea agreement bears the signature of defendant Williams adjacent to the date May 7, 2004, and the signatures of Dattan, Russo and the United States Attorney each adjacent to the date May 11, 2004.  At the evidentiary hearing, Williams testified that when he signed the plea agreement he left it undated because he wanted to make sure that the amount of cocaine he would be responsible for would be the subject of further review.  The court finds the testimony that the date was left blank for this purpose to be unworthy of belief.

The court's assessment of Williams based on his appearances to enter his plea and to be sentenced as well as his testimony at the evidentiary hearing is that he is bright, but that he is also wily and not above bending the facts to advance his own interests.  Williams is too smart to have actually believed that leaving the date line blank, as opposed to refusing to sign, was the way to assure further discussion of the drug quantity issue.  But, Williams is sly enough to invent the blank date ploy in an attempt to vitiate the fact that he signed the plea agreement (something which he knows he explicitly told the court he had done during the Rule 11 colloquy).  Moreover, an

---

[5]Doc. 296.

[6]*Id.* at p. 24.

examination of the original sealed document shows that when they signed, Williams, Dattan and Russo each used a different color of ink and that the color of ink used to fill in each date blank corresponds to the ink used for each of the signatures.[7]

Williams entered a plea of guilty on May 17, 2004. He was not sentenced until May 26, 2005. There were two reasons for the substantial delay, the first was the remarkably hard fought, complex and at times vexatious defense mounted by co-defendant Boehm, against whom Williams might have testified at trial in exchange for a reduction in his own sentence.[8] The second is that during the time relevant to this dispute, the law applicable to sentencing in federal courts underwent a substantial metamorphosis. It was the fluctuation in the law which underpinned much of Williams' unsuccessful effort to withdraw his plea.

On July 2, 2004, Williams filed a motion under seal seeking to withdraw his plea of guilty to one count of conspiracy to distribute controlled substances in violation of 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(C) and 859(a).[9] That motion was based on allegedly ineffective assistance of counsel and was supplemented by Williams' handwritten motion to withdraw based on both ineffective assistance of counsel and on the then recent Supreme Court decision in *Blakely v. Washington.*[10] The court appointed Henry Graper to represent Williams with respect to withdrawal of his plea of guilty, but Dattan was not discharged from his general responsibility for Williams' representation. On July 23, 2004, the court denied the motion to withdraw the plea.[11]

---

[7] Williams used dark black ink, Dattan a much lighter shade of black ink, and Russo a blue ink. Doc. 296 at pp. 31 and 32.

[8] Williams plea agreement contained a co-operation provision. Doc. 296 at pp. 6-14. As it turned out, Williams was unable or unwilling to provide the sort of testimony which the government thought would be useful against Boehm. Boehm did not go to trial, but there was a long and hotly contested sentencing proceeding.

[9] Doc. 409.

[10] 124 S. Ct. 2531 (2004).

[11] Doc. 443.

While Williams was engaged in limiting his exposure via his plea agreement, and then seeking to withdraw his guilty plea, the case went on with respect to the other defendants.  An examination of the entire record in this case discloses conduct involved in the conspiracies charged by the United States which was shocking and reprehensible.  Defendant Boehm, a wealthy local businessman also known as "Joe Millionaire," was purchasing vast quantities of cocaine from various sources including Williams, Bolling and others.   Boehm consumed the cocaine mostly at his home and frequently with minor girls many of whom essentially functioned as sex slaves in exchange for drugs.  Boehm himself had a prodigious capacity for cocaine and he made it available in virtually unlimited quantities to those who frequented his house.   While the whole edifice of criminality uncovered in this case centered upon the satisfaction of Boehm's cravings, the grand jury testimony of some of the underage females made it clear that Bolling and Williams did sometimes engage in sex with the children who were victimized by Boehm.  Moreover, the revolting nature of the situation made going to trial in this case an extremely unattractive option for any defendant with serious sentencing exposure.

Eventually all of the defendants pled guilty.  Boehm was able to plead guilty pursuant to a plea agreement which limited his maximum punishment to 135 months.  From the court's perspective this agreement, which was very favorable to Boehm, appeared to have been made, for three main reasons.  First, and most importantly, Boehm's guilty plea spared his child victims the agony of testifying at trial.  Second, Boehm's hard living and advanced age–he was 61 at the time of sentencing–made it highly likely that if he lived longer than his sentence, Boehm would no longer be a risk to the community.  Third, Boehm's plea agreement made provision for a very sizable fund from which to make payments for the rehabilitation of the child victims.

By the time Williams pled guilty, the despicable conduct which transpired in Boehm's home was known to both Russo who would have been present at the grand jury proceedings and to Dattan who had read the transcripts.  Despite Williams' undeniable involvement in the overall criminal activity at Boehm's house, in connection with Williams' sentencing Dattan found ways to argue, and to argue persuasively, that

Williams was not so culpable as one might imagine. Dattan pointed out in his sentencing memo, "There are two levels of crime here: the sale and purchase of controlled substances and the corruption of minors. Mr. Williams is central to the former and peripheral to the latter."[12] Furthermore, he argued at length at the time the court was considering the issue of how severe Williams' sentence should be that the court should impose a modest sentence taking into account a number of matters all of which could have supported a sentence somewhere between the 135 month sentence imposed on Boehm and the 36 month sentence imposed on Bambi Tyree.[13]

After the court had heard argument from both Mssrs. Dattan and Russo concerning the appropriate duration of the sentence to be imposed on Williams, the court turned to the question of whether the court should impose as a special condition of supervised release a requirement that Williams participate in a sex offender assessment. After hearing Mr. Russo advocate for such a requirement, the court turned to Mr. Dattan, and the following ensued:

> THE COURT: I've indicated that I – I agree with you in terms of the way one should characterize the past criminal history, but there is a serious concern here with what happened during the course of this conspiracy. I mean, I realize it was Mr. Boehm's sexual appetite that was constantly fed here, but there's clearly evidence that Mr. Williams and Mr. Bolling took advantage of these kids.
>
> MR. DATTAN: And, Your Honor, I have two daughters I absolutely cannot put myself in the position of defending any such conduct.[14]

Williams' lawyer then went on to point out that Williams thought anyone with whom he had sex was not a minor, a plausible explanation given the appearance of some of the young women.

---

[12]Doc. 760 at p. 5.

[13]Partial transcript, doc. 877 at pp. 8-16. A copy is attached as one part of exhibit G to the government's memorandum at doc. 879.

[14]*Id.* at pp. 24-25.

When Williams was sentenced, the court relied on the most recent pre-sentence report completed by the United States Probation office. Before doing so, the court ascertained that Williams had read that report and discussed it with his lawyer.[15] That report showed Williams to be at an offense level 31 with a criminal history category of III resulting in an advisory sentencing range under the U.S.S.C. Guidelines of from 135 to 168 months of incarceration. Mr. Russo asked for a sentence of 13 years (156 months),[16] but taking into account all of the factors set out in 18 U.S.C. §3553(a), and in hindsight, perhaps too strongly influenced by Mr. Dattan's arguments, the court imposed a sentence of only 124 months.[17]

Additional facts are noted in the next section of this order.

## IV.  DISCUSSION

### A. Ineffective Assistance Evidenced by Two Daughters Comment

Williams' contention that Mr. Dattan's reference to the fact that he had two daughters establishes that he was ineffective as Williams' advocate fails. Knowing, as Dattan did, that there was ample evidence in the grand jury testimony that both Bolling and Williams had sex with some of the minors who frequented Boehm's house and having no evidence to offer to contradict the children's sworn testimony, Dattan wisely alerted the court to the fact that as Williams' advocate (and a father) he could not

---

[15] *Id.* at pp. 3-4.

[16] *Id.* at p. 22.

[17] Judgment at doc. 796.

defend the conduct. However, he went on to explain that Williams believed the young women were not minors. Moreover, the two daughters comment was made in the context of a special condition of supervised release, considerably after Mr. Dattan had argued at length and with considerable persuasive force that Williams should be sentenced somewhere in a range bounded by Tyree's three year sentence on the low end and Boehm's sentence on the high end.

### B. Erroneous Allocation of Burden of Proof

The issue here is Williams' assertion that Dattan should have, but did not, insist that the quantity of drugs for which defendant was to be held responsible must be proved beyond a reasonable doubt to a jury. Instead, Dattan advised Williams that the drug quantity was something that could be the subject of fact finding by the judge. That advice was sound. Williams pled guilty to violating 21 U.S.C. § 846 subject to the penalty provisions of § 841(b)(1)(C) as adjusted pursuant to § 859(a). He was not exposed to the higher maximum sentence which would have been available if he had pled guilty to a violation of § 846 to which § 841(b)(1)(A) or (B) adjusted under § 859(a) would have applied. The plea agreement makes this perfectly clear when it recites the maximum penalties based on §§ 841(b)1)(C) and 859(a).[18] This more limited exposure was confirmed by the court in the Rule 11 colloquy with Williams.[19] It follows that there was no violation of the principle announced in *Apprendi v. New Jersey*[20] and made

---

[18] Plea Agreement, doc. 296 at p. 17.

[19] Doc. 879, Exhibit C at p. 16.

[20] 530 U.S. 466 (2000).

applicable to federal sentencing proceedings in *United States v. Booker*[21] that any fact which might increase the statutory maximum sentence must be proved to a jury beyond a reasonable doubt.

Williams may labor under a mis-conception that because a quantity of five kilograms would be sufficient to subject him to conviction and punishment in accordance with 21 U.S.C. § 841(b)(1)(A) which carries a maximum penalty of life in prison, he was somehow convicted and punished pursuant to that provision. In fact, he was not, because he did not plead guilty to such a charge. It simply happened that the amount of cocaine he admitted in his plea agreement would have been sufficient to support a plea to a conspiracy subject to the penalty in § 841(b)(1)(A), but no such plea was entered, and the punishment was imposed with reference to §§ 841(b)(1)(C).[22]

### C. Breach of Proffer Agreement

Williams' argument that there was a breach of the terms of the proffer letter when the United States filed a superseding indictment is a red herring. In the proffer letter, the parties agreed that Williams would "enter a plea of guilty to conspiracy to distribute controlled substances to underage persons."[23] It is true that the United States filed a superseding indictment that named Williams, but that is because Williams had not yet pled guilty to the existing indictment and there were other defendants against whom the new charges were to run. The fact is that Williams was allowed to and did plead guilty

---

[21] 543 U.S. 220 (2005).

[22] Of course, § 859(a) was also applicable. Its effect is to double the maximum under any of the subsections of § 841(b)(1) which might apply.

[23] Doc. 879, Exhibit A at p. 3.

to the very charge discussed in the proffer letter,[24] and the government agreed to dismiss all of the other charges against Williams.[25]

This argument, like most advanced by Williams focuses at least in part on the fact that the plea agreement sets out that there were five kilograms of cocaine involved in the conspiracy. However, that does not amount to an arrangement which differs from the proffer letter, because the proffer letter is silent on the quantity which was involved. At most the proffer letter implies that the plea would be subject to the maximum sentence obtained through the application of 21 U.S.C. S§ 841(b)(1)(C) and 859(a), and would not involve either § 841(b)(1)(A) or §841(b)(1) (B) each of which depends upon a specific minimum quantity of drugs. The plea agreement is entirely consistent with such an implied limit on Williams' sentencing exposure.[26]

### D. Coercion in Face of Dispute as to Five Kilograms

This argument also lacks merit. Williams was worried about the amount of cocaine for which he would eventually be held responsible, because he understood that the quantity would drive his guideline sentencing range. In the Rule 11 colloquy, it emerges that Williams knew he had admitted to five kilograms in the plea agreement, but remained concerned about the relevant conduct aspects of the potential total drug quantity.[27] Nevertheless, it is clear that Williams had expressly admitted in the plea

---

[24] *See* Plea Agreement, doc. 296 at p. 5.

[25] *Id.* at pp. 15-16

[26] *Id.* at p. 19.

[27] Doc. 879, Exhibit C at pp. 8-11.

agreement that there were five kilograms involved,[28] that he had read the plea agreement, discussed it with his lawyer, signed it, and had been promised nothing not set out in the plea agreement in exchange for his guilty plea.[29]

To the extent that Williams argues that he was coerced by Dattan either prior to signing the plea agreement, or during the nearly ten minute private discussion they had off the record during the plea colloquy, this court can find no credible evidence of such either in the testimony at the evidentiary hearing or elsewhere in the record. Rather, the court concludes that Williams accepted Dattan's advice to make the best of a bad situation by admitting that the quantity was five kilograms. Not only did this approach insulate Williams from the other serious charges which were included in the superseding indictment, but it also afforded Williams a chance to seek a reduced sentence by co-operating with the United States.[30]

### E. Plea Agreement Was Involuntary

The plea agreement was not involuntary because of Williams' supposed reservations about the five kilogram quantity. In essence this is the same argument as that advanced in the preceding section. For the same reasons, it must be rejected.

### F. Alleged Apprendi, Blakely and Ameline Error

The essence of Williams' argument here is that because he now disputes that the record establishes that there were five kilograms of cocaine involved in the conspiracy,

---

[28] Doc. 296 at p. 24

[29] Doc. 879, Exhibit C at pp. 12-13.

[30] Plea Agreement, doc. 296 at pp. 6-14.

he was denied his right to have every element of the crime proved to a jury beyond a reasonable doubt. However, because there was neither consideration of nor exposure to an increased maximum sentence pursuant to 21 U.S.C. § 841(b)(1)(A) or 21 U.S.C. § (b)(1)(B), there is no conflict with the principles established by *Apprendi v. New Jersey*[31] and its progeny.

### G. Second Final Pre-Sentence Report

Williams complains that the second final pre-sentence report should not have been prepared. There were three pre-sentence reports. The first was what is commonly referred to in this district as the draft report which is provided to the parties so that they may raise objections with the author of the report who may then respond to the objections and, if appropriate, make changes in the report. The draft report was prepared on January 13, 2005, in anticipation of a sentencing on February 17, 2005. In response Williams made numerous objections. As a result, the report was issued for a second time with an Addendum identifying Williams' objections and pointing to changes made in the report to account for some of his objections or to otherwise correct perceived errors. This second report was released on February 2, 2005, and consisted of the original report of January 13, 2005, and the Addendum. It was at that point that the United States made objections calling to the attention of the report's author that while the relevant penalty provision was, indeed, 21 U.S.C. §841(b)(1)(C), there actually was a specific amount, to wit, five kilograms, established as the quantity to be used in determining the guideline range. The sentencing date having been continued to May for

---

[31] 530 U.S. 466 (2000).

other reasons, there was time to examine the United States' objections and to file a revised report. This was done and the third report was released on April 5, 2005. This is the report Williams references as the "Second Final" pre-sentence report. Because this last report recognized that the amount of cocaine involved was five kilograms, the report had the effect of raising the adjusted Guideline offense level from a level 24 to a level 31, which in turn increased the guideline sentencing range quite substantially.

Williams strenuously objects to the issuance and use of the third ("Second Final") report. However, he points to no authority which precludes the pre-sentence author from keeping the court and parties advised of what the officer perceives to be new and important information. Addenda, if not entirely new reports, are commonly issued in this district. So long as the parties are given sufficient notice of the new information to prepare for the sentencing hearing, the court can conceive of no reason why a new report or an addendum should not be used so that the court may make use of the information which the author of the report considers more up to date, more accurate or more reliable. The third report was issued on April 5, 2005, and the sentencing was held more than a month later on May 26, 2005. Williams was afforded more than sufficient notice.

Use of the third report did not deprive Williams of any right. He is not entitled to any relief based on the use of the third report for his sentencing.

**H. Special Condition No. 4**

The judgment contains several special conditions which will come into effect when Williams is placed on supervised release. Williams asserts that one of them,

Special Condition No. 4 should not have been included in the judgment. Special Condition No. 4 reads as follows:

> The defendant shall participate in a program of sex offender assessment and if indicated by that assessment, treatment as determined by the assessing expert.[32]

The Ninth Circuit has explained that a district court may impose a special condition of supervised release only when the criteria set out in 18 U.S.C. § 3583(d) are satisfied.[33] That statute requires that the special condition be reasonably related to the considerations set out in 18 U.S.C. § 3553(a)(1), (a)(2)(B), (a)(2)(C) and (a)(2)(D); involve no greater limitation of liberty than is reasonably necessary to achieve the goals in §§ 3553(a)(2)(B), (a)(2)(C) and (a)(2)(D); and be consistent with any pertinent policy statement issued by the United States Sentencing Commission.

Special Condition No. 4 is based on the fact that Williams' conduct in connection with his drug dealing included having sex with some of the minors who frequented Boehm's home. Williams admitted that he had sex with the minors in the plea agreement.[34] The condition is related to Williams' history and characteristics. It therefor is reasonably related to 18 U.S.C. § 3553(a)(1). Given the serious nature of and appropriate societal concerns about adults having sex with minors, the condition is also reasonably related to the goals set out in §§ 3553(a)(2)(B), (C) and (D). Considering that the special condition requires only that Williams be evaluated and

---

[32] Judgment, doc. 796 at p. 4.

[33] *United States v. Napier*, 463 F.3d 1040, 1044 (9th Cir. 2006).

[34] Plea Agreement, doc. 296 at p. 24

comply with any treatment that might be found necessary by an expert evaluator, the condition imposes no greater a limitation on Williams' liberty than is reasonably necessary to achieve the statutory goals. Finally, the court is unaware of any policy statement by the United States Sentencing Commission which would not support use of this limited special condition in the circumstances present in this case. Williams is not entitled to relief from this provision.

### I. Ineffective Assistance of Counsel Generally

A recurrent theme in both the motion at docket 848 and the supplement at docket 859 is that Dattan provided ineffective assistance to Williams during the course of his representation. The court has addressed the specifics in the preceding sections, and here turns its attention to the possibility that there was some more diffuse failure to provide effective assistance that may be garnered from consideration of the testimony at the evidentiary hearing and the record as a whole.

Having carefully considered the matter, this court holds that there is no basis for concluding that Dattan provided ineffective assistance. To the contrary, Dattan provided Williams with sound advice and informed counsel the net effect of which was to save Williams from exposure to other very serious charges and a punishment more severe than that which actually was meted out to Williams under his plea agreement.

The refrain in Williams' song of woe is that he should have been given a chance to contest the 5 kilogram quantity to which he admitted in his plea agreement. However, counseling Williams to admit there were five kilograms involved in the conspiracy was consistent with a competent assessment of the evidence, for the fact is that the government would surely have been able to prove that such a quantity of drugs

was involved in the conspiracy. Russo represented that he could prove it. Co-defendant Bolling admitted that the conspiracy involved at least that much cocaine.[35] Given all of the evidence that would have been available at trial to show the very substantial amount of cocaine consumed in the Boehm house during the period of the conspiracy, it would have been naive to believe that the United States could not prove up the proposition that at lease five kilograms were involved.

Williams' is not serving 124 months in prison because Dattan failed to do a good job. Williams is serving such a substantial sentence because he and his co-defendants provided the large quantities of cocaine needed to fuel the long running debauchery in Boehm's house. But for Dattan's advocacy, Williams could easily have been sentenced to the 156 months recommended by Russo–or considerably more if he had refused the plea agreement and gone to trial on the charges in the superseding indictment.

## V.  CONCLUSION

For the reasons set out above, Williams' motion for relief from judgment at docket 848 is **DENIED**.

DATED at Anchorage, Alaska this 11th day of July 2007.

                                                  JOHN W. SEDWICK
                                        UNITED STATES DISTRICT JUDGE

---

[35] Bolling Plea Agreement, doc. 309 at p. 29.